# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 03 CR 532-2 |
| v. ) | |
| ROGER WOLF ) | HONORABLE DAVID H. COAR |
| ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

On August 10, 2004, a Second Superceding Indictment charged Defendant Roger Wolf ("Wolf" or "Defendant") with eight counts of wire fraud, in violation of 18 U.S.C. § 1343 and 2. On April 15, 2005, after a jury trial, Wolf was found guilty as charged in the Second Superceding Indictment. Presently before this Court is Wolf's motion for judgment of acquittal, pursuant to Fed. R. Crim. P. 29 ("Rule 29"). For the reasons set forth below, Wolf's motion is DENIED.

## I. Factual and Procedural Background

Illinois Vehicle Premium Finance Company ("IVPF") and Illinois Vehicle Insurance Agency ("IVIA") were companies formed by Wolf, that worked, in tandem, to sell automobile insurance policies to high risk drivers who could not obtain insurance from "standard" insurers (i.e., Allstate and State Farm). See Mot. for Acquittal, p.2.[1] Wolf was president of IVPF. Id. In

---

[1] "Mot. for Acquittal" refers to Defendant's Roger Wolf's Motion For Judgment of Acquittal.

1988, Wolf hired Jerome Januszewski ("Januszewski") to serve as IVPF's and IVIA's Chief Financial Officer. Id. Wolf owned similar operations in Texas and Florida. Id.

In a typical IVPF sale, a new customer purchased a six or twelve month insurance policy, but did not have to pay the entire policy premium cost upon purchase. See Mot. for Acquittal, p. 2. Rather, IVPF would collect a down payment from the new customer with his or her application, and allow the customer to finance the remaining premium in monthly installments over the term of the policy. Id. IVPF would purchase the policy from an insurance carrier, and then collect the monthly installment payments from the customer. Id. These monthly installment payments included interest and other fees due IVPF in exchange for financing the premium cost. Id.

In 1995, IVPF entered into a Collateralization Agreement with Texas Commerce Bank National Association, currently known as JP Morgan Chase Bank (hereinafter referred to as "Chase"). Mot. for Acquittal, p.2. Pursuant to the Collateralization Agreement, Chase made $32.5 million in funding available to IVPF. Id. at pp. 2-3  Each month, Chase would buy premium finance contracts from IVPF, and forward IVPF the funds it needed to complete the purchases relating to those new customers. Id. at p. 3  In return, IVPF assigned the future payments it was due on these financed policies (the "receivables") to Chase. Chase and IVPF renewed and reissued their agreements in 1997, until IVPF had over $55 million available from Chase to finance new policies. Id.

The new policies and receivables that were assigned to Chase were listed on a funding report that IVPF sent to Chase approximately once a month. Mot. for Acquittal, p. 3. As noted by several witnesses at trial, including Richard Melton ("Melton"), a consultant for Chase, and

Januszewski, Chase did not purchase all of the policies that IVPF issued. Id. Chase only purchased those policies that were defined in the Agreements as "eligible", and only those that were included in the Funding Reports that IVPF sent Chase. Id.

The Collateralization Agreement also required IVPF to set up a "Deposit Account" in which it would deposit monthly payments received from customers whose policies were bought by Chase. Mot. for Acquittal, p. 3. In addition, pursuant to the Collateralization Agreement, the only payments that were to be deposited into this Deposit Account were the monthly payments or receivables owned by Chase; commingling was prohibited. Id. Further, IVPF was required to submit to Chase daily reports of monies deposited into the Deposit Account, to insure that all of the funds in the Deposit Account were being wired to Chase in accordance with the parties' agreement. Id. at pp. 3-4. Additionally, IVPF was required to submit a monthly servicer's report to Chase that included all of IVPF's new loan sales for the month and tracked the total receivables that Chase owned. Id. at p. 4.

In late 1999, Chase noticed a discrepancy between the amount of receivables IVPF reported in its October 1999 Servicer's Report and the amount of receivables reported in IVPF's most recent financial statements. Mot. for Acquittal, p. 5. On November 2, 1999, Chase sent a letter to IVPF noting that it had discovered a $9 million shortfall in the Collateral Pool Balance. Id. Until this shortfall was reconciled, Chase ceased funding any new policies to IVPF. Id. According to Chase's investment advisors, Kris Harihara and Joseph Lorusso of Structured Finance Associates, they were unable to conduct an audit or review of IVPF's records until October 2000.

According to the evidence presented by the Government, after Chase ceased funding, Januszewski wire transferred $300,000 out of the Deposit Account to IVPF's main operating account. Mot. for Acquittal, p. 5. Melton testified that such a transfer was prohibited by the Agreements, as were all other transfers that occurred from December 1999 through September 2000. In total, Januszewski made over 50 similar wire transfers out of the Deposit Account totaling $6,255,000.000 Id. at p. 6. During Wolf's trial, Januszewski claimed he instituted these wire transfers after discussing IVPF's need for additional funds with Wolf, and it was under Wolf's direction that Januszewski made these wire transfers. Id. Januszewski testified that he concealed these transfers, per Wolf's instructions, by underreporting IVPF's policy sales on the monthly Servicer's Reports sent to Chase during the Indictment Period. Id.

In October 2002, Melton and Harihara visited IVPF's offices and compared IVPF's bank records to the deposits IVPF reported in its September 2000 Servicer's Report. Mot. for Acquittal, p.6. According to Melton, he immediately discovered the wire transfers out of the Deposit Account to IVPF's other operating accounts. Id.

In May 2003, Januszewski was indicted on eight counts of wire fraud, pursuant to 18 U.S.C. § 1343. In August 2003, Januszewski entered a plea of guilty. On August 21, 2003, a superceding indictment, that named both Januszewski and Wolf as defendants, was returned. According to the Indictment, Wolf concealed the diversion of funds by directing Januszewski to fax inaccurate monthly Servicer's Reports to Chase during the indictment period. As noted above, on April 15, 2005, after a jury trial, Wolf was found guilty as charged in the August 10, 2004 Second Superceding Indictment.

## II. Legal Standard for Rule 29 Motion

Wolf moves for judgment of acquittal pursuant to Rule 29. "A motion for judgment of acquittal should only be granted if there is insufficient evidence to sustain the conviction." United States v. O'Hara, 301 F.3d 563, 569 (7th Cir. 2002) (citing United States v. Jones, 222 F.3d 349, 351-52 (7th Cir. 2000); Fed. R. Crim. P. 29(a)). When evaluating a motion for judgment of acquittal pursuant to Rule 29, the court must view the evidence, "in the light most favorable to the government," and determine whether that evidence "could support any rational trier of fact's finding of all the essential elements of the crime beyond a reasonable doubt." United States v. Brown, 328 F.3d 352, 355 (7th Cir. 2003) (citing United States v. Williams, 298 F.3d 688, 691-92 (7th Cir. 2002)).

## III. Analysis

The Defendant argues that judgment of acquittal pursuant to Rule 29 is warranted for two reasons. First, Wolf argues that there was no evidence at trial that the funds diverted from the Deposit Account actually belonged to Chase, and without such a diversion, there is no evidence of a "scheme to defraud." Second, Wolf contends that the Government claimed that it did not have to prove any actual diversion, as long as there was evidence of Wolf's attempt to divert funds that he thought belonged to Chase. Wolf asserts that because "attempt to commit fraud" is not the crime for which he was indicted, there is a material variance between the Government's indictment and its proof, which demands a judgment of acquittal. Each argument will be addressed in turn.

### A. Was There Insufficient Evidence Of A Scheme to Defraud?

Defendant argues that at trial, there was no evidence that the funds IVPF transferred out of the Deposit Account actually belonged to Chase, and therefore, no evidence that monies were diverted or converted by Wolf. Defendant contends that virtually all of the Government's witnesses testified that they did not know how much of the money in the Deposit Account belonged to Chase at any given time during the Indictment period, and that they could not trace any of the wire transfers to Chase-owned funds. Wolf maintains that the absence of any transfer of money or property from Chase renders the Government's case fatally insufficient, and directs this Court to acquit Wolf.

Wolf attacks the sufficiency of the evidence, and as this Court previously noted, it must evaluate "the sufficiency of the evidence in the light most favorable to the government, and [will] grant [Defendant's] motion only where no rational jury could have returned a guilty verdict." United States v. Jenkins, 218 F.R.D. 611, 613 (N.D. Ill. 2003) (citing United States v. Hausmann, 345 F.3d 952, 955 (7th Cir. 2003)). Wolf argues in his Rule 29 motion that there was no evidence that the funds in the Deposit Account belonged to Chase. However, viewing all evidence in the light most favorable to the Government, approximately $6,000,000 of those funds did belong to Chase. The most significant evidence regarding these funds was provided by Januszewski, IVPF's controller. Again, viewing the evidence in the light most favorable to the Government, Januszewski's testimony revealed that IVPF had significant financial problems during the Indictment period, and would not be able to stay in operation without additional funds. The testimony revealed that per Wolf's direction, Januszewski diverted Chase funds from the deposit account.

In his memorandum in support of his Rule 29 Motion, Defendant argues that at most, the Government proved a scheme that breached the technical provisions of a contract. Further, Defendant maintains that there was no evidence that Chase had any right to or was otherwise entitled to funds belonging to IVPF, merely because those funds were temporarily deposited into the Deposit Account. At the close of evidence in Wolf's trial, the jury received the following instruction:

> Neither negligence nor a breach of contract standing alone can form the basis of a scheme to defraud for purposes of the wire fraud charged in counts one through eight.

Consequently, the jury was instructed that a mere breach of the technical provisions of the Parties' contract could not form the basis of the scheme to defraud. Therefore, viewing the evidence in the light most favorable to the Government, Wolf and Januszewski did more than merely co-mingle funds that rightfully belonged to IVPF in the Deposit Account set aside for Chase funds. Wolf and Januszewski knowingly diverted funds that belonged to Chase to IVPF, in violation of the wire fraud statutes. Accordingly, there was sufficient evidence presented by the Government upon which the jury could convict Wolf.

In addition, Wolf notes that the Government asserted that it need not prove that Chase actually lost money in order to prove the requisite scheme. At the close of evidence, the jury received the following instruction:

> The wire fraud statute can be violated whether or not there is any loss or damage to the victim of the crime or gain to the defendant.

Defendant argues that the Seventh Circuit's decisions in <u>United States v. Walters</u>, 997 F.2d 1219 (7th Cir. 1993) and <u>United States v. Davuluri</u>, 239 F.3d 902, 906 (7th Cir. 2001) stand for the proposition that the government must prove that money or property was transferred from the

victim to the defendant as part of a fraudulent scheme in order to convict under the mail or wire fraud statutes. In Walters, Norby Walters, a sports agent, was charged with conspiracy, RICO violations, and mail fraud. Walters, 997 F.2d at 1221. The mail fraud charge arose from Walter's actions that caused NCAA-eligible universities to pay scholarship funds to athletes who had become ineligible to play because they signed professional sports contracts with Walters. Id. The Government argued that the mail fraud statutes were violated because each university required its athletes to verify their eligibility to play by mail sent to the appropriate conference (i.e., the Big Ten). Id. Walters was convicted by a jury, but that conviction was reversed because of certain procedural matters. Id. Subsequently, Walters entered a conditional Alford plea to the mail fraud charge, and the conspiracy and RICO charges were dismissed. Id. at 1221-22. In their decision, the Seventh Circuit noted that Walters "did not mail anything or cause anyone to else to do so (the universities were going to collect and mail the forms no matter what Walter did)." Id. at 1222. The relevant question for the Seventh Circuit in reviewing Walters' Alford plea was whether the scheme, as conceived by Walters, "caused the universities to use the mails." Id. at 1222-23. The Seventh Circuit found that there was no evidence that Walters actually knew that the colleges would mail the athletes' forms. Id. at 1223. Further, the Seventh Circuit found that Walters did not actually take the universities' scholarship benefits in order to profit from the deceit; rather, Walters took a portion of the players' professional incomes. Id. at 1224. Finding the Walters' mail fraud conviction must be reversed, the Seventh Circuit held:

> [O]nly a scheme to obtain money or other property from the victim by fraud violates § 1341. A deprivation is a necessary but not sufficient condition of mail fraud. Losses that occur as byproducts of a deceitful scheme do not satisfy the statutory requirement.

Walters, 997 F.2d at 1227. Thus, the Seventh Circuit's holding focused upon Walters' *intent.* The Seventh Circuit held that there could not be any mail fraud, via the university forms, because Walters' scheme never involved defrauding the universities.

Additionally, Wolf directs the court, to Davuluri's affirmation of the holding in Walters ("The section of Walters on which Davuluri relies stands for the proposition that the government must prove that money or property was transferred from the victim to the defendant as part of a fraudulent scheme in order to convict under the mail or wire fraud statutes." Davuluri, 239 F.3d at 906 (citing Walters, 997 F.2d at 1227)). Again, however, Wolf erroneously places his focus upon whether funds were transferred, when Davuluri's holding is focused upon the Defendant's intent to defraud the victim that is the subject of the indictment. From the evidence presented by the Government, it is clear that Chase was the intended victim of Wolf's fraudulent scheme.

Moreover, "[t]he wire fraud statute can be violated whether or not there is any damage to the intended victim of the crime." United States v. Sanders, 696 F.Supp. 327, 329 (N.D. Ill. 1988) (citing United States v. Keane, 852 F.2d 199, 205 (7th Cir. 1988) ("the mail fraud statute proscribes fraudulent schemes; it does not confine penalties to those who succeed in raking off cash. . ."); see also United States v. Serpico, 320 F.3d 691, 694 (7th Cir. 2003). Consequently, it is well established in the Seventh Circuit that the wire fraud statute can be violated whether or not there is any loss or damage to the intended victim of the crime or gain to the defendant.

### B. *Was There A Material Variance Between The Indictment And The Proof At Trial?*

Defendant notes that the allegations of the Second Superceding Indictment are that Wolf and Januszewski defrauded Chase out of $6,000,000 of Chase's money, and concealed this fraud through the Servicer's reports they faxed to Chase every month. Wolf argues that there is a material variance between the offense charged against Wolff–a scheme to defraud by diverting Chase funds–and the offense proven–a breach of the Servicing Agreement and IVPF's duties under the Agreement. Wolf maintains that the facts proven at trial are materially different from those alleged Second Superceding Indictment. Wolf contends that this material variance prejudiced Wolf's ability to defend against the charges, and thus, this variance warrants a judgment of acquittal.

"Convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment." United States v. Lovett, 811 F.2d 979, 986 (7th Cir. 1987) (internal citations omitted); see also, United States v. Magana, 118 F.3d 1173, 1188 (7th Cir. 1997). Further, the Supreme Court has stated:

> The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to "affect the substantial rights" of the accused. The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he many be enabled to present his defense and not be taken by surprise by the evidence offered by the trial; and (2) that he may be protected against another prosecution of the same offense.

Lovett, 811 F.2d a 986 (quoting Berger v. United States, 295 U.S. 78, 8 2 (1935)).

As an initial matter, as this Court noted above, viewing all evidence in the light most favorable to the Government, there was no material variance between the indictment and the

evidence presented at trial. Viewing all evidence in the light most favorable to the Government, Januszewski and Wolf converted at least $6,000,000 in funds which should have been remitted to Chase. Consequently, Wolf's attempt to argue that at most, the Government may have proven that Wolf and IVPF breached several provisions of the Servicing Agreement and improperly commingled Chase funds with IVPF funds is unavailing. As previously noted by this Court, the jury was instructed, "Neither negligence nor a breach of contract standing alone can form the basis of a scheme to defraud for purpose of the wire fraud charged in counts one through eight." The evidence showed that Wolf, along with co-Defendant Januszewski, knowingly and intentionally diverted funds that they knew belonged to Chase, for their own use. Thus, viewing the evidence in the light most favorable to the Government, the proof upon which Wolf's conviction was based corresponds to the offenses set forth in the indictment. Further, Wolf was fully apprised and informed of the charges against him, and there is no risk of double jeopardy in this case. Consequently, there was no material variance between the indictment and the proof presented by the Government.

**IV. Conclusion**

For the foregoing reasons, Wolf's motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29 is DENIED.

Enter:

/s/ David H. Coar

_____
David H. Coar
United States District Judge

Dated: **August 31, 2005**